**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | | |
|---|---|---|
| **FRANK ROBINSON FLOWERS, II,** | : | |
| **and DEBRA LYNN FLOWERS,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **3:03-CV-35 (CAR)** |
| | : | |
| **WAL-MART STORES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

*ORDER ON MOTION FOR SUMMARY JUDGMENT*
*AND MOTIONS TO STRIKE*

Before the Court are Defendant's Motion for Summary Judgment (Doc. 38), Plaintiffs'

Motion to Strike Defendant's Defenses Relating to Liability (Doc. 47), and Defendant's Motion to

Exclude Expert Witness Report (Doc. 77).  In this case, Plaintiff Frank Robinson Flowers, II (Mr.

Flowers) contends that he was injured by the collapse of a ladder owned by Defendant Wal-Mart

Stores, Inc. (Wal-Mart) while working as an independent contractor on Wal-Mart's premises.

Plaintiffs contend in their Motion to Strike that Wal-Mart's defensive pleadings should be stricken

due to the destruction of certain evidence by Wal-Mart.  In Defendant's Motion to Strike, Wal-Mart

seeks to exclude the amended and verified expert witness report of Mr. Flowers's treating physician,

Dr. Robert Dicks, which was submitted as an affidavit in opposition to the Motion for Summary

Judgment.  Defendant's Motion for Summary Judgment and the two Motions to Strike are related

1

and are addressed together in this Order.  For the reasons set forth below, all three motions are

**DENIED**.

I.      **Material Facts**

In reviewing a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party and draw all favorable inferences in favor of that party, without weighing conflicting evidence or making credibility determinations.  Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918-19 (11th Cir. 1993).  The facts set forth below are taken primarily from Mr. Flowers's testimony, along with facts that are undisputed.

Mr. Flowers seeks to recover for injuries sustained on November 28, 2000, when he fell from a ladder at the Wal-Mart store in Elberton, Georgia.  Mr. Flowers was working on a regular basis as an independent contractor providing maintenance on the lighting in the store.  His work primarily consisted of changing fluorescent bulbs and replacing ballasts in the ceiling fixtures.  In addition to his own tools and supplies, which he kept in a cart at the store, Mr. Flowers used a ladder provided by Wal-Mart.  The ladder was an A-frame step ladder constructed of fiberglass and aluminum with a weight capacity rating of 375 pounds.  Two steps below the top of the frame, the ladder provided an aluminum platform that folded down and spanned from the back legs to the front legs.  The platform was at just the right height to allow Mr. Flowers comfortable access to the light fixtures above his head, which were approximately fourteen feet from the floor.

Mr. Flowers was familiar with the ladder.  It was provided to him for his use in the maintenance of the light fixtures, and he stored it with his cart of tools in the back of the store.  He had used it on at least fourteen occasions before his fall, each time opening and closing it, ascending and descending it multiple times without incident.  There is testimony to suggest that other

employees used the ladder from time to time as well, though Mr. Flowers appears to have been the primary user.  No one from Wal-Mart ever warned Mr. Flowers that the ladder was defective or dangerous.  Mr. Flowers himself never had any reason to suspect that the ladder was defective or that there was any danger in using it.

While Mr. Flowers was working on a light fixture in the sporting goods section of the store, the aluminum platform broke, and Mr. Flowers fell to the floor.  The ladder also fell to the floor. There were no witnesses in a position to observe the ladder collapse, although a Wal-Mart employee on a nearby aisle was alerted to the incident and announced a "Code White" over the store's PA system.  At Wal-Mart, "Code White" signifies an injury to a customer.  Shortly after the fall, store manager Michael Sherman and assistant manager Patsy Massey arrived on the scene.  Mr. Sherman observed the ladder on the floor and exclaimed, "I told them this damn thing was going to kill somebody."  His immediate reaction was to pick up the ladder and carry it to a compactor in the back of the store where he destroyed it.  No pictures were taken of the ladder or of the scene of the fall, and the Wal-Mart employees failed to conduct the investigation required by Wal-Mart policy in cases of customer injury.  Prior to the destruction of the ladder, Mr. Flowers did not have an opportunity to inspect it to determine what caused the platform to break.  There is no evidence to indicate that Mr. Flowers himself failed to set up the ladder properly or that he otherwise made improper use of the ladder.

## II.     Legal Analysis

Plaintiffs' claims against Wal-Mart are premises-liability claims.  Under Georgia law an owner or occupier of land has a duty to exercise ordinary care to protect invitees from "unreasonable risks of harm of which the owner has superior knowledge." Hamblin v. City of Albany, 612 S.E.2d

69, 71 (Ga. Ct. App. 2005).  The elements of a premises liability claim are summarized in the following quote from Georgia's Court of Appeals:

> For an invitee to recover for injuries sustained as a result of the owner's failure to exercise such care, the invitee must establish both that the landowner had actual or constructive knowledge of the hazard, and that the invitee lacked knowledge of the hazard despite the exercise of ordinary care. [Cit.] The true basis for an owner's liability is his superior knowledge of the existence of a condition that could subject his invitees to an unreasonable risk of injury.

Garrett v. Hanes, 616 S.E.2d 202, 204 (Ga. Ct. App. 2005).  As evidence that there was a hazardous defect in the ladder and that Wal-Mart had superior knowledge of the defect, Plaintiffs rely primarily on Mr. Sherman's alleged statement that he knew the ladder "was going to kill somebody" and his act of destroying the ladder.  This evidence is sufficient to create a genuine issue of material fact and to allow Plaintiffs to avoid summary judgment.  It does not, however, warrant the striking of Wal-Mart's defenses.

### A.    Wal-Mart's knowledge of a hazardous condition

The evidence regarding the destruction of the ladder and Mr. Sherman's statement, along with reasonable inferences drawn therefrom, could support a finding that Wal-Mart had knowledge of a defect in the ladder.  Mr. Flowers has testified that his fall was caused by a failure of the platform and not by any improper use of the ladder.  Wal-Mart has no evidence, beyond speculation, to refute this testimony.  Mr. Sherman has admitted that the ladder was damaged when he observed it, although the nature of the damage he allegedly observed is not clear from his deposition testimony.  (Sherman Dep., Doc. 65, p. 86).  The ladder itself would have been important evidence as to the cause of the fall.  It is undeniably curious that Mr. Sherman's immediate reaction on arriving at the scene was to destroy this most significant piece of evidence.  A reasonable jury might infer from this reaction that Mr. Sherman was conscious of guilt and destroyed the ladder to

4

eliminate evidence that could lead to liability against his employer.  This inference of guilt is supported by the additional fact that Mr. Sherman and other Wal-Mart employees failed to take photographs or otherwise conduct an investigation of the incident according to Wal-Mart policy.

Without such an inference from the destruction of the ladder, Plaintiffs cannot establish the first element of their premises liability claim.  It is no longer possible to examine the ladder to determine whether some defect or damage caused it to fail or to evaluate whether such a defect should have been apparent upon a reasonable inspection of the ladder before it collapsed.  There is no direct evidence that any employee of Wal-Mart ever observed or caused a hazardous condition in the ladder, whether during use of the ladder or during routine safety inspections.  There is no evidence that Wal-Mart failed to conduct adequate inspections of its equipment.  This lack of evidence is due in large part to the destruction of the ladder, and Wal-Mart cannot be rewarded for such an act, whether it was an intentional spoliation of evidence or merely a bad decision by an impulsive manager.

### B.        Motion to Strike

Persisting issues of material fact require the denial of Plaintiffs' Motion to Strike, which is in essence a motion for summary judgment in favor of Plaintiffs on the issue of Wal-Mart's knowledge.  Plaintiffs characterize Mr. Sherman's destruction of the ladder as an intentional spoliation of evidence that denied Plaintiffs the opportunity to examine the ladder and look for any evidence of a defect that might have caused its collapse.  In their Motion to Strike, Plaintiffs ask the Court to sanction Wal-Mart for the alleged spoliation of evidence by striking Wal-Mart's defenses as to the existence of a defect in the ladder and as to Wal-Mart's knowledge of the defect.  In other words, Plaintiffs ask the Court to "rule that Wal-Mart's ladder was latently defective and that Wal-

Mart had knowledge of the latent defect, and to prevent Wal-Mart from introducing any evidence to rebut these findings." ( Plaintiffs' Motion to Strike, Doc. 47, p. 10.)  As if it were a motion for summary judgment, the Motion to Strike calls for a finding that Plaintiffs have established the first element of a premises liability claim as a matter of law.

Although this evidence is sufficient to create a genuine issue of material fact about the existence of a defect in the ladder and Wal-Mart's knowledge of the defect, it does not warrant striking Wal-Mart's defenses or prohibiting it from presenting evidence to rebut inferences favorable to the Plaintiffs.  Based upon the record, the Court cannot find as a matter of law that Mr. Sherman intentionally destroyed evidence.  The most appropriate remedy for the destruction of the ladder is to submit the evidence to a jury with instructions that it may draw inferences as to Wal-Mart's knowledge based upon Mr. Sherman's actions.

In a diversity action, federal law governs the authority of a court to impose sanctions for spoliation of evidence.  See King v. Illinois Central R. R., 337 F.3d 550, 555-56 (5th Cir. 2003); Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001).  Because such spoliation is conduct which disrupts the judicial process and inhibits the truth-seeking functions of a court, a court's power to impose sanctions arises from its inherent power to control the process of litigation. Silvestri, 271 F.3d at 590.   In courts in the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."  Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997).  In this case, whether Mr. Sherman's destruction of the ladder was predicated on bad faith remains a question for the jury.  After receiving an appropriate jury instruction, a jury will have to evaluate the testimony and credibility of the witnesses and draw its own inferences.

Even applying the Georgia law cited by Plaintiffs, the Court would exercise its discretion to allow a properly instructed jury to determine what inferences to draw from the destruction of the ladder.  Under Georgia law, "[t]o remedy the prejudice resulting from the spoliation of evidence, a trial court may (1) charge the jury that spoliation of evidence creates the rebuttable presumption that the evidence would have been harmful to the spoliator; (2) dismiss the case; or (3) exclude testimony about the evidence."  R. A. Siegel Co. v. Bowen, 539 S.E.2d 873, 877 (Ga. Ct. App. 2000).  In this case the remedy of dismissal is too extreme.  Questions remain about Mr. Sherman's intent in destroying the ladder.  The better course is to submit to the jury the question of Mr. Sherman's bad faith in the destruction of the ladder and to charge the jury that such bad faith, if any, would give rise to an inference that the production of the ladder would have been unfavorable to the Defendant, that the ladder contained a defect, and that Wal-Mart had knowledge of the defect.

## C.      Mr. Flowers's  knowledge of a hazardous condition

The evidence is also sufficient to create a genuine issue of material fact as to whether Wal-Mart had knowledge of the hazardous condition that was superior to Mr. Flowers's  knowledge.  Mr. Sherman's alleged exclamation as he was carrying the ladder away indicates that he not only observed a defect in the ladder following the fall, but also that he was aware of that defect prior to the fall.  Mr. Flowers has testified that Mr. Sherman exclaimed, "I told them this damn thing was going to kill somebody."[1]   From this statement a jury could conclude that Mr. Sherman, and therefore Wal-Mart, had actual rather than constructive knowledge that the ladder was defective and posed a risk of substantial harm to its users.

---

[1]It should be noted that Mr. Sherman and Wal-Mart dispute that this statement was made, although it is undisputed that Mr. Sherman destroyed the ladder.  The statement is admissible as a non-hearsay admission pursuant to Rule 801(d)(2)(D) of the Federal Rules of Evidence.

With regard to Mr. Flowers, by contrast, the evidence indicates only that he had constructive knowledge of the defect.  In this case, it is hard to imagine any defect in the ladder that would have been apparent to Mr. Sherman but not equally apparent to Mr. Flowers in the exercise of ordinary care.  It was Mr. Flowers who made most frequent use of the ladder.  He testified that he had used the ladder on at least fourteen prior occasions.  On each occasion he repeatedly set the ladder up and took the ladder down, unfolded the platform into place and folded it back up, climbed up the ladder and climbed down the ladder.  He stored the ladder next to his tool cart.  He was responsible for removing the ladder from its storage position upon arrival and re-securing it prior to departure from Wal-Mart.

As the regular user of the ladder, Mr. Flowers had the best opportunity to be aware of any latent defect in the ladder.  There is no evidence that Mr. Sherman ever used the ladder.  There is no evidence that any employee of Wal-Mart who used the ladder or inspected the ladder ever informed him of any defect in or damage to the ladder.  Nevertheless, a reasonable jury could conclude, based upon Mr. Sherman's statement on the scene, that he somehow had actual knowledge that the ladder was dangerous.  As the evidence concerning Mr. Flowers indicates merely constructive knowledge of the defect, that jury could then conclude that Wal-Mart had the superior knowledge and had a duty to protect Mr. Flowers from the hazardous condition.  This single statement is a small peg on which to hang an entire case, but it is enough at least to get past summary judgment.

**D.      Assumption of the Risk**

8

Wal-Mart's assumption of risk defense is without merit.  As noted above, there is no evidence that Mr. Flowers had actual knowledge that the ladder was defective and made a conscious decision to use the ladder in spite of its defect.  As the Court of Appeals of Georgia makes clear in the very case on which Wal-Mart relies:

> Knowledge of the risk is the watchword of assumption of risk, and means both actual and subjective knowledge on the plaintiff's part. The knowledge that a plaintiff who assumes a risk must subjectively possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes injury. The knowledge requirement does not refer to a plaintiff's comprehension of general, non-specific risks that might be associated with such conditions or activities.

Sones v. Real Estate Development Group, Inc., 606 S.E.2d 687, 689 (Ga. Ct. App. 2004).  It is no defense to say that Mr. Flowers assumed the risk because he was aware of the general, non-specific risks associated with climbing a ladder.  Wal-Mart must show that he was aware that the particular ladder he was climbing was defective and that he decided to use it anyway.  There is no evidence to support this defense.

The warning labels on the ladder, cited by Wal-Mart, are simply irrelevant.  Among other things, these labels warn of the dangers of failing to secure the spreaders before climbing the ladder, of over-reaching, of standing above the second step, of overloading the ladder, of erecting the ladder in the vicinity of electric wires, and of erecting the ladder on uneven or unstable surfaces .  There is no evidence that Mr. Flowers failed to heed any of these warnings.  Mr. Flowers's uncontradicted testimony is that he fell when the ladder's platform suddenly broke underneath him.  Nothing in the record indicates that he had any knowledge of this particular risk, and the labels provided no warning that the platform might collapse.

**E.       Injury and Causation**

9

Wal-Mart's contention that there is insufficient evidence of a causal connection between Mr. Flowers's injuries and his fall from the ladder is likewise without merit. Clearly, the question of Mr. Flowers's damages is complicated by a work-related injury several months before his fall and by an automobile accident several months after the fall, but the evidence about his injuries and their connection to his fall present a typical jury question.

Based on his subjective testimony alone, a jury could award plaintiff some measure of damages. It is undisputed that Mr. Flowers fell from a height of approximately seven to eight feet and landed on his buttocks on a concrete floor. Such a fall is very likely to result in injury and could easily have caused injuries more severe than those complained of by Mr. Flowers.

The day after the fall, Flowers went to his doctor and complained of increased pain in his lower back. He was unable to return to work at that time and still has not returned to work. Depending on the jury's assessment of Flowers's testimony, it could find that the fall aggravated his pre-existing injury or caused a new injury, resulting in pain and suffering and decreased ability to earn a living.

In addition to Mr. Flowers's testimony, his treating physician, Dr. Robert Dicks, a neurosurgeon, offers opinions about causation and damages. Plaintiffs have submitted the January 16, 2004, expert report of Dr. Dicks, sworn to and notarized, in lieu of an affidavit. Attached to the expert report are Mr. Flowers's medical records. In the expert report, Dr. Dicks opines that "Mr. Flowers's fall from the ladder on 11/28/2000 exacerbated and worsened the pre-existing conditions . . . and that he suffered new trauma to his lumbar spine." (Dicks's Report, Doc. 71, ¶ e.) This evidence further creates genuine issues of material fact about the cause and scope of Mr. Flowers's injuries.

Wal-Mart has moved to exclude Dr. Dicks's report arguing that it fails to disclose the facts and rationale underlying his opinions and that "the opinions contained in the reports are based exclusively on the subjective information provided to Dr. Dicks by Plaintiff Frank Flowers." (Defendant's Motion to Exclude, Doc. 77, p. 3.) The latter argument is incorrect. Subjective reports of pain and other symptoms by a patient are an important part of a physician's examination, and doctors routinely rely on such statements.[2] Dr. Dicks's opinion, however, is based on more than just Mr. Flowers's word. Dr. Dicks states that Mr. Flowers's subjective report of significantly increased pain the day after his fall "was confirmed on physical examination." (Dicks's Report, Doc. 71. ¶ e.) The report also includes and incorporates Mr. Flowers's medical records, which show that Dr. Dicks referred Mr. Flowers for testing on December 6, 2000, including x-rays, electromyography (EMG), and magnetic resonance imaging (MRI). The records and Dr. Dicks's report also indicate that Dr. Dicks reviewed the results of an MRI, CT scan, and myelogram taken in September, 2000, after his first back injury but before his fall. In addition to the subjective reports of the patient, a hands-on physical examination, and various radiological tests, Dr. Dicks performed surgery on Mr. Flowers's spine on January 5, 2001, and thus had a chance to observe the condition of Mr. Flowers's spine with his own eyes.

Dr. Dicks's report demonstrates that his opinion is admissible under the requirements of Rule 702 of the Federal Rules of Evidence. Rule 702 permits the admission of testimony by a witness qualified as an expert by knowledge, skill, experience, training, or education, if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

---

[2]Indeed, the Federal Rules of Evidence, at Rule 803(4), recognize that statements for purposes of medical diagnosis or treatment, including statements describing past or present symptoms, pain, or sensations are sufficiently reliable to be admitted as exceptions to the hearsay exclusion.

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

There can be no question in this case that Dr. Dicks is qualified as an expert. He received his medical degree in 1973 and has practiced as a board certified neurosurgeon specializing in cranial, spinal and peripheral nerve surgery for more than twenty-five years. He was board-certified as a neurological surgeon in 1982. His report shows that he applied the methods and principles of a skilled neurosurgeon in arriving at his diagnosis. Both before and after the fall in question, he took into account the subjective representations of his patient, conducted a physical examination, and had objective tests performed. These are the procedures that competent doctors follow in reaching a diagnosis and determining a course of treatment.

It is significant in this case that Dr. Dicks is Mr. Flowers's treating physician, not simply an expert who makes a living providing opinion testimony or one retained for purposes of litigation to provide an opinion based on facts presumed to be in evidence. His examination and diagnosis were part of his routine activities as a doctor, which should not be subject to an extensive analysis under Daubert[3] and Kumho Tire.[4] Though Daubert and Rule 702 require district courts to exercise a "gatekeeper" role as to expert testimony, it is generally appropriate "to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted." Kumho Tire, 526 U.S. at 152. This is just such an ordinary case in which a treating physician offers a medical opinion that a fall from a ladder onto a concrete floor aggravated a back injury.

---

[3]Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

[4]Kumho Tire Co. V. Carmichael, 526 U.S. 137 (1999).

The record in this case establishes that Dr. Dicks's opinion is sufficiently reliable to be admissible under Rule 702. Although Daubert itself outlines four non-exclusive factors that may be considered in determining the reliability of expert testimony, district courts have broad latitude to determine whether those factors are applicable in a particular case and to consider other relevant indications of reliability. Kumho Tire, 526 U.S. at 153. The four Daubert factors are not helpful in this case where the expert witness is not a retained expert proposing a technique or scientific theory to evaluate a given set of facts, but rather is a treating physician who has applied routine and accepted medical practices to the diagnosis and treatment of a patient with whom he had an ongoing patient-physician relationship.

Several factors support the reliability of Dr. Dicks's testimony. First, Dr. Dicks's testimony is reliable because it arises directly from a long-standing, patient-physician relationship. His examinations were conducted independently of this litigation, and his diagnosis was not developed expressly for purposes of testifying. In the context of a retained expert, a court may consider whether the expert "is being as careful as he would in his regular professional work outside his paid litigation consulting." Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997) (quoted in Fed. R. Evid. 702, Advisory Committee Notes for 2000 Amendments). In this case, Dr. Dicks's opinions arise in the actual course of his regular professional work, not merely in the context of paid litigation. Second, the standard of care for the medical profession in Georgia requires a physician to exercise reasonable care in diagnosing and treating a patient, and the failure to exercise such care authorizes a claim for medical malpractice. (See O.C.G.A. § 51-1-27.) The threat of harm to a patient, not to mention the possibility of malpractice litigation, imposes a high level of

13

accountability on a practicing physician.  This accountability is arguably more rigorous than the accountability peer review imposes on the work of scholars.

Finally, the field of expertise claimed by Dr. Dicks – neurosurgery – is known to reach reliable results for the type of opinion he gives.  <u>See</u> Fed. R. Evid. 702, Advisory Committee Notes for 2000 Amendments (citing <u>Kumho Tire</u>, 526 U.S. at 151-53).  Dr. Dicks's field of expertise is neurosurgery, not "astrology or necromancy."  <u>Kumho Tire</u>, 526 U.S. at 151.  Patients rely on the expert opinions of neurosurgeons in making serious decisions about their health, and experts in the field are known to reach reliable results in diagnosing and treating spinal injuries.  The court concludes that this factor supports a finding of reliability.

Wal-Mart complains that Dr. Dicks has failed to account for obvious alternative explanations for the cause of Mr. Flowers's injuries.  <u>See</u> Fed. R. Evid. 702, Advisory Committee Notes for 2000 Amendments (citing <u>Claar v. Burlington N.R.R.</u>, 29 F.3d 499 (9th Cir. 1994)).  Based on his examination and testing, along with Mr. Flowers's subjective complaints, Dr. Dicks determined that Mr. Flowers's injuries on November 29, 2000, were "significantly worse" than they were when Mr. Flowers last visited Dr. Dicks's office on November 8, 2000.  Based on this observation, Dr. Dicks gives his opinion that the November 28, 2000, fall aggravated Mr. Flowers's pre-existing lumbar condition and resulted in the need for surgery on January 5, 2001.

Although Wal-Mart criticizes the reliability of Dr. Dicks's opinions because he failed to exclude any other possible causes for Flowers's new injuries, the court finds that this factor is neither decisive nor helpful in this case.  The jury will have to decide what, if any, injury the fall from the  ladder caused, and Dr. Dicks will be subject to vigorous cross-examination on this issue.  As the Supreme Court has stated: "Vigorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[5]

Finally, the Court must address Wal-Mart's contention that Dr. Dicks's testimony should be excluded because his report failed to comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure.  Wal-Mart contends that the report "fail[s] to disclose, in any intelligible way, the facts and rationale underlying the opinions addressed."  (Defendant's Motion to Exclude, Doc. 77, p. 2.)  The Court finds that the report, which incorporates Mr. Flowers's medical records, is sufficiently thorough to give Wal-Mart reasonable notice of his opinions and the data on which he based his opinions.  The written expert report requirement of Rule 26(a)(2)(B) does not apply to Dr. Dicks, in any event.  Rule 26(a)(2)(B) requires an expert report only from "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony."  A treating physician is neither.

Dr. Dicks is involved in the case not because he was retained or specially employed to give his testimony, but because he was the doctor who treated Mr. Flowers long before any litigation began, indeed, well before the incident itself.  The Advisory Committee Notes for the 1993 Amendment to Rule 26 specifically recognize that "[a] treating physician . . . can be called to testify at trial without any requirement for a written report."  See also Brown v. Best Foods, 169 F.R.D. 385 (N.D. Ala. 1996).  Because the report itself was not required under the Federal Rules, Dr. Dicks's testimony cannot be excluded for any alleged deficiency in his report.

**F.     Punitive Damages**

---

[5]Daubert at 596.

Wal-Mart is entitled to summary judgment with regard to any claim for punitive damages.

The Georgia Code, at O.C.G.A. § 51-12-5.1(b), provides that:

> Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

To obtain an award of punitive damages, a plaintiff must show circumstances of aggravation or outrage. Mableton Parkway CVS, Inc. v. Salter, 615 S.E.2d 558, 563 (Ga. Ct. App. 2005). "Negligence, even gross negligence, is inadequate to support a punitive damage award." Newitt v. First Union Nat'l Bank, 607 S.E.2d 188, 197 (Ga. Ct. App. 2004). The evidence in this case is sufficient to suggest negligence, or at most gross negligence on the part of Wal-Mart. The record is devoid of any evidence of the sort of egregious conduct or willful disregard of consequences necessary to support an award of punitive damages.

## III.    Conclusion

Upon due consideration of the arguments of counsel, the relevant legal authorities, and the evidence in the record of the case, and for the reasons set forth above, Defendant's Motion to Exclude (Doc. 77), Plaintiffs' Motion to Strike (Doc. 47), and Defendant's Motion for Summary Judgment (Doc. 38) are hereby **DENIED**.

**SO ORDERED**, this the 27th day of October, 2005.

S/ C. Ashley Royal
C. ASHLEY ROYAL
United States District Judge

16